Arthur ROBERTS, by his Father and
Guardian, Eddie W. Roberts,
Plaintiff,

v.

Columbus WILLIAMS, individually and
as Trusty at the Leflore County
Farm, et al., Defendants.

No. GC 6635–K.

United States District Court
N. D. Mississippi,
Greenville Division.

July 30, 1969.

Donald R. Wilson, John J. Haugh, Pozzi, Wilson & Atchison, Portland, Or.; Martha M. Wood, Lawrence A. Aschenbrenner, Lawyers Committee for Civil Rights Under Law, Jackson, Miss., for plaintiff.

Stanny Sanders, R. C. McBee, Norman Brewer, Porter Peteet, Greenwood, Miss., for defendants.

## OPINION

KEADY, Chief Judge.

In this § 1983 action, plaintiff, Arthur Roberts, a 14 year old Negro suitor, sues for monetary damages upon four causes of action set forth in his complaint.[1] The

---

1. 42 U.S.C. § 1983, provides that:
 "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

While plaintiff and all defendants were, at the time suit was instituted, residents of Leflore County, Mississippi, federal jurisdiction is unaffected, for diversity of citizenship is not a jurisdictional requisite in Section 1983 actions. Jackson v. Martin, 261 F.Supp. 902 (N.D.Miss. 1966); see also Walton v. City of Atlanta, 181 F.2d 693 (5 Cir. 1950), cert. den. 340 U.S. 823, 71 S.Ct. 56, 95 L.Ed. 604; 28 U.S.C. § 1343, Annot. 5.

first cause of action, here detailed to state plaintiff's basic claim, may be summarized as follows: On April 15, 1965, defendant Gray Evans, who held office as prosecutor for the City of Greenwood, Mississippi, but in this instance acting specially as Municipal Judge, heard a charge of petty larceny against plaintiff, convicted him of the offense, and gave him a 90 day jail sentence, prior to entry of an order of the Youth Court Division of the Leflore County court or notice to his parents, and in violation of his federal constitutional rights. On April 19, 1965, defendant Charles Pollard, Youth Court Judge, allegedly conducted a hearing at which plaintiff's parents were present, but not plaintiff, and upon recommendation of defendant Charles Deaton, the Court's Youth Counsellor, ratified the conviction and sentence imposed by defendant Evans, knowing same to have been violative of the Youth Court Act.[2] On June 28, 1965, while serving his sentence at the Leflore County Farm to which he had been transferred from the city jail, plaintiff was injured from a shotgun blast into his face, which gun he charges was intentionally or negligently discharged by Columbus Williams, a Negro and also an inmate of the county farm, who was serving as an armed trusty.[3] Also sued as defendants were John Arterbury, Superintendent of the Leflore County Farm, the members of the Board of Supervisors of Leflore County,[4] County Sheriff George W. Smith, and Fidelity and Deposit Company, Sheriff's official surety. Arterbury is specifically alleged to have appointed Williams to the position of trusty at the County Farm, knowing of his reputation for violence, and the Supervisors are allegedly charged under Mississippi law with responsibility for the supervision and management of the Leflore County Farm. These acts are jointly and severally charged to have violated plaintiff's rights under the laws and Constitution of the United States.

The aforementioned allegations are also incorporated into a second cause of action charging common law assault and battery, into a third cause of action charging negligence of all defendants other than the official surety, and into a fourth cause of action charging false imprisonment. Although these claims standing alone would not be cognizable here for lack of diversity of citizenship between all plaintiffs and all defendants, they so closely relate to the § 1983 action that they are within the ancillary or pendent jurisdiction of this court. See Hurn

---

2. Miss.Code Ann. § 7185–16 (Supp.1968), provides, in pertinent part, as follows:

"Whenever any child thirteen (13) years of age or older is brought before any justice of the peace court or municipal court charged with the commission of a misdemeanor under a state law or municipal ordinance, such court shall, unless prosecution is permitted by order of the youth court, transfer the case to the Youth Court of the county, to be dealt with as a case of delinquency in accordance with the provisions of this act * * *."

Miss.Code Ann. § 7185–06 (Supp.1968), provides that:

"[T]he [Youth Court] judge shall fix a date and designate a place for the hearing of the case concerning said [allegedly delinquent] child, and shall order the clerk of the court to issue summons to the person having the custody or control of the child, requiring such person to appear personally and bring the child before the court at the time and place stated * * *."

Miss.Code Ann. § 7185–16 (Supp.1968), provides that:

"After conviction and sentence of any child * * * prosecuted for a misdemeanor * * * by a justice of the peace or municipal court, the Youth Court of the county shall have full power to stay the execution of such sentence and to release such child on good behavior, or other such order as the court may see fit to make."

3. Columbus Williams was also sued as a defendant but personal process was never had upon him and the case went to trial accordingly. His deposition was taken in Chicago, Illinois, by plaintiff's counsel and will be later referred to.

4. The Leflore County Supervisors, each sued individually and in official capacity, are: Ulysses F. Smith, W. J. Lipscomb, Robert H. Swanzy, James D. Green and James M. Hooper, Jr.

v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933); 28 U.S.C. § 1338(b).

■ On March 31, 1967, Circuit Judge Claude F. Clayton, then District Judge, granted summary judgment in favor of Pollard and Deaton on the ground of judicial immunity and they were dismissed from the suit.[5] Motion for summary judgment was overruled as to the defendant Evans. The court overruled Arterbury's motion to dismiss for failure to state a claim on the first three causes of action but said motion was sustained as to the fourth.[6] Defendant Smith, the County Sheriff, and his official surety were also granted motion for summary judgment, which was not opposed by plaintiff. A motion to dismiss filed by the members of the Board of Supervisors was deferred until trial.

A three-day trial on the merits commenced February 18, 1969, and developed the following facts: On the afternoon of April 14, 1965, plaintiff was arrested on a charge of petty larceny and was taken to the Greenwood City Jail, where he remained overnight awaiting trial.

The next morning he was taken before Charles Pollard, Judge of the Youth Court, who conducted a hearing in the presence of plaintiff and his father, Eddie Roberts, and determined that plaintiff, having been in Youth Court on a prior occasion and transferred for ordinary criminal prosecution, should be tried for misdemeanor in city court. In accordance with custom, city court officials were at once notified by telephone of the action taken by the Youth Court.[7] That afternoon at the city court trial, which was also attended by Eddie Roberts, plaintiff entered a plea of guilty before Gray Evans, Acting City Judge.[8] The court accepted plaintiff's guilty plea and sentenced him to 90 days' imprisonment. Pursuant to city-county agreement, plaintiff was shortly thereafter transferred from city jail to the Leflore County Farm for serving his sentence. At the time of this transfer, a detention warrant, advising nature of the conviction and sentence imposed but giving no other information, was delivered to the farm superintendent.

5. See Memorandum Opinion dated March 31, 1967, citing, among other authorities, Pierson v. Ray, 5 Cir., 352 F.2d 213 (1965); Robichaud v. Ronan, 351 F.2d 533 (9 Cir. 1965); Kenny v. Fox, 232 F.2d 288 (6 Cir. 1956); and Tate v. Arnold, 223 F.2d 782 (8 Cir. 1955).

6. Judge Clayton's Memorandum Opinion concluded that the allegations that Arterbury, acting under color of state law, deprived plaintiff of privileges and immunities secured to him by the Fourteenth Amendment, sufficiently state a federal claim under § 1983. See Monroe v. Pape, 365 U.S. 167, 168, 81 S.Ct. 473, 5 L.Ed. 2d 492 (1961). Causes of action two and three for damages resulting from defendant Williams' alleged assault and battery on the plaintiff state a claim under state law, as an official or employee of a county having custody of prisoners is liable for knowingly or negligently permitting them to be abused. See Farmer v. State, 224 Miss. 96, 79 So.2d 528 (1955); Miss.Code Ann. § 7915 (1942 Recomp.). He is not liable, however, for false imprisonment, as state law imposes no duty upon him, as County Farm Superintendent, to inquire into the validity of a state court sentence.

7. On January 5, 1965, an initial youth court petition had been filed against plaintiff for breaking and entering Mississippi Valley College and stealing a bicycle, and all statutory formalities had been complied with, resulting in the transfer of plaintiff to justice of the peace court for criminal prosecution. After Judge Pollard made his determination on the morning of April 15, 1965, that plaintiff should be prosecuted in city court, the court officials made certain entries that date on the Youth Court docket, which were erased after a decision was reached between Charles Deaton, Youth Court Counselor, and the court clerk that "for bookkeeping purposes" a supplemental petition should be filed. This was done on April 16, process had on plaintiff's father and order entered April 19, 1965 transferring case. There was, in fact, no hearing on April 19, the only hearing having occurred on April 15, but no formal judgment was signed by the judge of the youth court prior to April 19.

8. Evans had been serving as pro tem. Judge since 1962 by virtue of a continuing order effective when the regular judge was out of the city and he sat in that capacity several times each month.

The Leflore County Farm, maintained by the County Board of Supervisors, pursuant to statute, consisted of certain farm acreage and a dormitory styled building called the "cage", which usually housed about 25 to 30 county convicts serving prison sentences. The administration of the farm was under defendant Arterbury, an experienced law enforcement officer, who had had at the time of the incident more than 18 years of service as either superintendent or assistant superintendent. In accordance with their practice, the Supervisors had rehired Arterbury from year to year as he had performed his work satisfactorily and was regarded as a competent administrator and a person of good judgment. The inmates at the county farm work out their sentences on the farm or, as may be determined by the Board of Supervisors, on the public roads or other public works in the county. For a period of many years, the Supervisors had, if not by formal order, acquiesced in and approved the use of the farm prisoners as road gangs performing work on the county roads, bridges and public cemeteries, which was alternated weekly among the five Supervisors' districts and carried out under the direct supervision of a road foreman. During that period of time there had developed, with the Board's knowledge and approval, a trusty system by which certain inmates, selected by Arterbury, were accorded special privileges and responsibilities and some of whom were used as armed guards or "shooters", carrying loaded guns when guarding prisoners out "on the line" doing road work away from the farm. In some instances Arterbury, receiving authority from the Board, hired outside personnel as armed guards. Columbus Williams, a 23 year old Negro with a 4th grade education, serving time for conviction of the offenses of assault and battery with intent to kill and petty larceny, had been chosen by defendant Arterbury as an armed guard. For this purpose, Williams had been daily furnished a 12 gauge pump shotgun and a quantity of shells containing 7½ shot. On June 28, 1965, plaintiff was detailed as a member of a work crew in Beat 5 near Minter City, and Williams was guarding the prisoners. Shortly before noon, the road foreman departed the work site, leaving Williams in charge, and the work crew stopped for lunch at a county-owned barn. As the plaintiff, after lunch, was resting on the ground not more than 50 feet from the barn entrance where Williams stood guard, and in his plain view, Williams, then having the shotgun cradled under his right arm, caused it to discharge directly into plaintiff's face, causing his blindness in both eyes, brain damage and other injuries resulting in total and permanent disability.[9] Admittedly, at the time of the shooting Williams had the shotgun loaded with 5 shells, one of which was in the firing chamber, ready to shoot in accordance with his instructions, and the safety was off. The shotgun could not have been discharged with the safety on, as it was in good working order. There is no evidence that Williams stumbled or dropped the gun or suddenly knocked the safety off. Williams was unable to give a satisfactory explanation of why the gun discharged and he failed to check the safety mechanism after its discharge. Although plaintiff suggests that the shooting was deliberate and done to satisfy a grudge, no witness actually saw Williams in the act of pulling the trigger and all present ob-

9. There is no dispute concerning plaintiff's injuries. He was immediately taken to Leflore County Hospital, rushed to University Hospital at Jackson, Mississippi, for emergency treatment, and sent back to Leflore County Hospital, where he remained until August 1965. Later, under special hospital care at Vicksburg, he spent approximately three months learning to walk with a cane, to read braille and perform other services. On March 4, 1967, he enrolled in the Mississippi School for the Blind, having completed the 9th grade at time of trial. Complete blindness has resulted with recurring headaches and occasional fainting spells. He is handicapped in the reading of braille by inability in use of his arms. Medical evidence indicates he has suffered brain injury from the accident and, with a life expectancy of 49 years, he will be wholly incapacitated.

served his apparent shock and grief over the shooting. Necessarily, however, Williams was grossly negligent in the handling of the loaded weapon, knowing that it was ready for instant firing with a shell in the chamber and nonetheless pointing it in the direction of plaintiff who was in full view, without making certain that the safety was on, or without examining the gun to determine whether the safety might have become disengaged through previous handling. Arterbury had selected Williams as a shooter because "he was obedient, did his work right and never gave me any trouble." This occurred several months after Williams had arrived at the farm as an inmate, and Arterbury was familiar with the fact that Williams had been a sheriff's trusty while at the county jail. He ascertained, on casual inquiry, whether Williams knew how to handle and use a shotgun, and he relied upon Williams' telling him that his father had taught him how to use a gun as he had often hunted as a child. Arterbury gave Williams only the briefest instructions concerning the use of the gun, telling him "to be careful". There were no meaningful demonstrations by Arterbury or his assistants to teach Williams the use of the gun or its safe handling, or to make certain that he was competent for guard duty. Specifically Williams was not instructed, at all costs, never to point the

shotgun in any direction or at any object at which he was not ready to fire, nor was he instructed to, at all times, examine the safety to determine that it had not become dislodged. But Arterbury did instruct Williams to inject a shell into the firing chamber whenever the work crew had reached the area where guard duty would commence. So far as is known, prior to the shooting, Williams had never shot the gun in target practice, nor had he at any time received expert instruction as to its care and handling. He, thus, remained ignorant as to proper safety practices in handling the gun although being entrusted with it and he allowed it to discharge under wholly unnecessary and grossly careless circumstances, so as to maim plaintiff for life, without any cause or provocation.

I.

## JUDICIAL IMMUNITY OF GRAY EVANS

■ Plaintiff's case for § 1983 liability against defendant Evans for his acts as pro tem. Municipal Court Judge [10] rests primarily upon the contention that Evans may not claim judicial immunity because the city court was utterly without jurisdiction to impose sentence; and in this respect plaintiff relies upon state statutes vesting jurisdiction in the Youth Court.[11] It is a firmly established princi-

---

10. Complaint charges Evans with the following alleged violations of plaintiff's constitutional rights: illegal confinement; acting as both judge and prosecutor; failing to advise plaintiff of his right to counsel; and subjecting plaintiff to the infliction of cruel and inhuman punishment.

11. The Mississippi Youth Court Act, Miss. Code Ann. § 7185-01 et seq., provides in relevant part as follows:
"§ 7185-03. Jurisdiction.—Except as otherwise provided herein, the court shall have exclusive original jurisdiction in all proceedings concerning any delinquent or neglected child residing or being in the county." (No exceptions are here applicable).
"§ 7185-04. Retention of jurisdiction. —When jurisdiction shall have been ob-

tained by the court in the case of any child, jurisdiction of such person as well as of any offenses by him committed may be retained or resumed by the court until he becomes twenty years of age. * * * *"
"§ 7185-16. Transfer of misdemeanor cases from other courts unless prosecution permitted by youth court.—Whenever any child thirteen years of age or older is brought before any justice of the peace court or municipal court charged with the commission of a misdemeanor under a state law or municipal ordinance, *such court shall, unless prosecution is permitted by order of the youth court, transfer the case to the youth court of the county, to be dealt with as a case of delinquency in accordance with the provisions of this act,* * * *. After conviction and sentence of any child so prose-

ple that a judge is protected from civil liability for acts done in excess of the jurisdiction of his court or which are alleged to have been done maliciously or corruptly. Bradley v. Fisher, 13 Wall. (80 U.S. 335), 20 L.Ed. 646 (1871). The only exception to nonliability was for an act done in "the clear absence of all jurisdiction over the subject matter." [12] Expressly holding that the doctrine of judicial immunity was unaffected by the passage of § 1983 and was applicable to all judges, including municipal court judges, the United States Supreme Court reaffirmed the rule of *Bradley* in Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). By the rule of this case, the civil liability of a judge exceeds the bounds of immunity only when done in "clear absence of all jurisdiction over the subject matter." The wisdom for faithfully adhering to this rule is obvious. "It is a judge's duty to decide all cases * * * before him, including controversial cases that arouse the most intense feelings in the litigants. His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to principled and fearless decision-making but to intimidation." Pierson v. Ray, supra, 87 S.Ct. at 1218, 18 L.Ed.2d at 294.[13]

The doctrine of judicial immunity is fully recognized in Mississippi. Bell v. McKinney, 63 Miss. 187 (1885); DeWitt v. Thompson, 192 Miss. 615, 7 So.2d 529 (1942).

Under the foregoing cases, Evans stands absolved from any civil liability to plaintiff, because he did not act with utter lack of subject matter jurisdiction. Plaintiff had been arrested for committing petty larceny, a violation of municipal law, and he was booked and jailed in city court on that charge. Admittedly, Evans had the legal authority to act as city judge; and plaintiff appeared in court and pleaded guilty to a criminal offense. Plaintiff's attack upon existence of subject matter jurisdiction rests entirely upon the absence of a written judgment of transfer by the Youth Court signed, entered and on file at the time of the city court trial. Yet there can be no doubt that Youth Court Judge Pollard had exercised his continuing jurisdiction over plaintiff at a hearing actually conducted prior to the trial in city court, and a valid determination had then been made by the Youth Court consenting to plaintiff's prosecution. The statutes relied upon by plaintiff were substantially complied with. The mere fact that formal judgment was not entered until April 19, four days after the city court trial, does not nullify the city court's jurisdiction nor invalidate plaintiff's conviction and

cuted for a misdemeanor, as above set out, by a justice of peace or municipal court, the youth court of the county shall have full power to stay the execution of such sentence and to release such child on good behavior, or other such order as the court may see fit to make." (Emphasis added).

12. In Bradley v. Fisher, supra, at page 651, the Court said:
 "Where there is clearly no jurisdiction over the subject matter, any authority exercised is a usurped authority, and for the exercise of such authority, when the want of jurisdiction is known to the judge, no excuse is permissible."

13. As Judge Learned Hand observed in Gregoire v. Biddle, 177 F.2d 579, 580–581 (2 Cir. 1949):

" * * * [judicial] immunity is absolute and is grounded on principles of public policy. The public interest requires that persons occupying such important positions * * * should speak and act freely and fearlessly in the discharge of their important official functions.
 * * * * *
"There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. * * * [I]t has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation."

sentence. § 7185–16 stays the hand of the city court "unless prosecution is permitted by *order* of the youth court." An "order of youth court", as that term is so used, can only be interpreted as the pronouncement of the court at the conclusion of its hearing; and the entry of a written judgment, though necessary to the completion of the record, is not a judicial, but a clerical, act. The Mississippi Supreme Court in Welch v. Kroger Grocery Company, 180 Miss. 89, 177 So. 41, 42 (1937), recognized the well-settled state law in these words:

"In courts of law, the judgment is rendered when the court signifies its assent to the sentence of the law as a result of the proceedings in the case, Clark v. Duke, 59 Miss. 575, 579; or, as otherwise stated, a judgment at law is the pronouncement thereof at the conclusion of the trial, Simpson v. Boykin, 118 Miss. 701, 718, 79 So. 852. The entry of the judgment is a clerical or ministerial act, to be performed by the clerk, and is not the judicial act. Cresswell v. Cresswell, 164 Miss. 871, 879, 140 So. 521, 144 So. 41. This is the rule in all common-law states, save as modified by statute; the rule being further that upon rendition, without entry, the judgment is valid and binding between the parties. See text and numerous cited cases, 34 C.J. pp. 44 et seq."

United States v. Meredith, 172 F.2d 745 (7 Cir. 1949), cited by plaintiff, agrees with the foregoing rule in these words:

"The court clearly advised the defendant of his sentence at the time of the hearing and this was supplemented, as in all cases, whether civil or criminal, by formal judgments entered upon the court record in compliance with what the court had directed. There is no requirement in the law that the formal sentences be reduced to final form in the presence of the defendant. His rights were fully protected by the announcement of the court in his presence."

It is to be noted that the statute does not require the order of the Youth Court to be in writing or to be cast as a judgment before the juvenile may be proceeded against criminally. Indeed, the informality of the Youth Court proceedings and the expeditious manner in which they operate support our interpretation that Judge Pollard, in this instance, effectively released Youth Court jurisdiction over plaintiff. Moreover, by proceeding with the case prior to being presented with a written order of transfer, defendant Evans might have acted prematurely and more properly should have awaited the receipt of the Youth Court judgment before disposing of the case on its merits, as no doubt the absence of such judgment in the record of conviction would have resulted, on appeal, in its reversal and vacation of sentence. Lee v. State, 214 Miss. 740, 59 So.2d 338 (1952). But it is not every judicial error requiring reversal that entitles a defendant to damages against the sentencing judge; to so hold would destroy the salutary doctrine of judicial immunity. Finally, in any event, Evans, as City Judge pro tem., was, by the very terms of § 7185–16, vested with jurisdiction to transfer the case to the Youth Court. Such an order was clearly authorized. Proceeding to trial and sentence, prior to consent of the Youth Court, would have been erroneous and in excess of jurisdiction but not altogether beyond the scope of all power to act. Indeed, Evans was not an interloper but sat as a court with power to act and at least limited authority and jurisdiction. Entry of an erroneous judgment under such circumstances would not destroy his judicial immunity. A close analogy to the case at bar may be found in Bell v. McKinney, supra, in which Wagner, the Mayor and ex-officio Justice of the Peace having jurisdiction only as a conservator of the peace for offenses committed outside the municipality, illegally convicted and sentenced a plaintiff for a misdemeanor committed outside the municipality. The Court exonerated Wagner of civil liability for an act done in excess of his jurisdiction, and held the

officer was not liable "under the circumstances for errors of judgment or mistakes of law committed in the execution of his office." To like effect is McGrew v. Holmes, 145 Iowa 540, 124 N.W. 195 (1910).

## II.

## PERSONAL LIABILITY OF AN INDIVIDUAL MEMBER FOR THE ACT OR NEGLECT OF THE COUNTY BOARD OF SUPERVISORS

Although plaintiff acknowledges that an action cannot lie under § 1983 against Leflore County or its governing body, the Board of Supervisors,[14] it is earnestly contended that individual board members are personally liable for the negligence of Arterbury and Williams as their agents in the operation of the county farm, and for the Board's utter failure to adopt any regulations whatsoever for the guarding of prisoners while employed on county road work. Neither of these contentions is supportable under applicable state or federal law.

By Mississippi law, it is "the imperative duty" of the Board of Supervisors to require convicts sentenced to imprisonment in the county jail to work out the sentence on the county convict farm or, as the Board may provide, on the public roads or other public works, Miss.Code Ann. §§ 7900–7901. It is well settled state law that in the establishment and regulation of jails and work houses, a municipal corporation acts in its governmental, and not private, capacity. Jones v. City of Amory, 184 Miss. 161, 185 So. 237 (1939), citing authorities: 41 Am.Jur., Prisons and Prisoners, § 3, p. 886. There is no tort liability upon a county, or its Board of Supervisors, in performing this basic governmental function. Moreover, assuming joint and several negligence on the part of Arterbury and Williams in the operation of the county farm, the doctrine of respondeat superior is not applicable so as to cast a personal responsibility upon individual supervisors. The Board of Supervisors is directed by statute to "employ a competent and suitable person * * * as foreman of county farm to superintend such convict farm and manage it and to work the convicts sentenced to the county jail thereon." Miss.Code § 7901. The foreman or superintendent of the county farm is the agent of the county and not that of the individual supervisors. Jackson v. Gordon, 173 Miss. 759, 163 So. 502 (1935).[15] This would also be true as to subordinate agents, such as Columbus Williams, selected by Arterbury in any phase of handling the prisoners. It necessarily follows that the acts of subor-

---

14. The cases are legion that cities and counties are not amenable to suit under § 1983. See, e. g., Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Charlton v. City of Hialeah, 188 F.2d 421 (5 Cir. 1951); Hewitt v. City of Jacksonville, 188 F.2d 423 (5 Cir. 1951); Cobb v. City of Malden, 202 F.2d 701 (1 Cir. 1953); Agnew v. City of Compton, 239 F.2d 226 (9 Cir. 1956); Cuiska v. City of Mansfield, 250 F.2d 700 (6 Cir. 1957). Neither are states, Williford v. People of California, 352 F.2d 474 (9 Cir. 1965); the United States, Broome v. Simon, 255 F.Supp. 434 (W.D. La.1965), school districts, Harvey v. Sadler, 331 F.2d 387 (9 Cir. 1964), or police departments, United States ex rel. Lee v. People of Illinois, 343 F.2d 120 (7 Cir. 1965).

15. In this case, a member of the Board of Supervisors was sued for personal injuries sustained by the plaintiff as a result of the negligence of Northern, who had been employed for the county by defendant-supervisor. Plaintiff's claim arose out of a traffic accident involving negligent operation by Northern of a county truck in the course of his duties. Rejecting liability, the Mississippi Supreme Court held:

"In the present case the [defendant] member of the board had nothing whatever to do with the alleged wrongful act of Northern. Gordon was acting in the capacity of road commissioner for his district; Northern, although employed by Gordon acting as such commissioner, was the servant of the county and not of Gordon. The county was the principal, not Gordon."

dinate agents would not, under the doctrine of immunity in the performance of a governmental function, impose liability upon the municipal corporation for such tortious acts. See 14 Am.Jur., Counties, § 50, p. 217. Here, the only obligation upon the Board, as an entity, was to employ a competent and suitable person as foreman with authority to manage the farm and to work the prisoners; and Arterbury was a competent and suitable person so that the Board's statutory duty was fully discharged.

■ Plaintiff presses his case against the individual members of the Board by pointing to the negligence of the Board in its failure to adopt, as required by § 7904 of Miss.Code Ann., "all proper regulations for guarding the prisoners," when they well knew and approved the use of prisoners to work on public roads, bridges and other public jobs.[16] The evidence shows that the Board neither adopted a formal order as such to permit the county prisoners to do public work away from the farm, nor established any regulations whatever for guarding convicts while at work. In these respects, there was a default on the part of the Board of Supervisors and a failure to comply with statutory requirement. The Board actually acquiesced over a period of many years in the use of county convicts on road and other public works, and left to the superintendent of the farm the entire matter of handling and guarding the prisoners while at work; and

the members of the Board were aware that Arterbury, as county farm superintendent, would use inmates from time to time as armed trusties to guard other prisoners while away from the farm. It is asserted that because of this positive neglect by the Board in its performance of a statutory duty, individual responsibility attaches to each supervisor. On the other hand, each supervisor pleads an immunity on two grounds: first, that a suit against them is in actuality a suit against the county; and second, that they are not individually answerable in a suit to redress private wrong for the Board's neglect. We hold the first defense, which is based upon Miss.Code Ann. § 4049.5 (1942 Recomp.),[17] is untenable. The fact that, under the quoted statute, Leflore County may, in its discretion, satisfy from the public coffers a personal judgment rendered against one or more supervisors is immaterial. If the county were bound by a statute to make payment for personal default, that might be another matter, but that is clearly not the case before us. What the county might elect to do toward paying the individual obligation of a supervisor, if it may legally do so, is not of present concern; the significant thing in this context is that Leflore County is required to do nothing toward satisfying a judgment obtained against an individual supervisor.

[9] The second defense raised by the supervisor-defendants is that they are not made individually liable for a viola-

16. Miss.Code Ann. § 7904, provides:
"§ 7094. Convicts may be worked on public roads or other county public works.
In any county where it is clearly more advantageous to the county to work the county convicts or some of them on the public roads of the county, or on other works of the county exclusively public in their character, the board of supervisors shall have the authority so to order, and *in such cases the board shall establish all proper regulations for the working, guarding*, safekeeping, clothing, housing and subsistence *of convicts while so working*, and shall provide all the necessary equipment for such purpose. And the board shall establish regulations for

the discipline of convicts on said works, and on county farms, when a convict is persistently idle or refractory, and may enforce such regulations by penalties." (Emphasis added)

17. Miss.Code Ann. § 4049.5 provides, inter alia, that:
" * * * [A]ny municipality of this state be and it is hereby authorized and empowered, within the discretion of the governing authorities, to pay and satisfy any judgment, fine, or penalty which may be made, assessed or levied by any court against any municipal agent, officer, servant, employee or appointee * * * while acting as such."

tion of § 7904 by failure to promulgate and establish proper regulations for guarding county prisoners, and the default in this respect would be negligence of the Board, as a corporate entity, which is not personally chargeable to any member thereof. An examination of this defense requires a close study of applicable state law. In Mississippi, a county board of supervisors is not a mere ministerial agent of the State, but is charged with far ranging duties that are judicial, legislative and executive in character. A member of the board of supervisors is "not a ministerial but is a quasi-judicial officer". McNulty v. Vickery, 126 Miss. 341, 88 So. 718 (1921).[18]

While many courts draw a distinction, as would plaintiff, between personal responsibility of a board member for the nonperformance of a ministerial duty, and no liability for failure to perform discretionary duties, that distinction does not appear to obtain in Mississippi, in respect of private suits to redress an individual wrong. The correct rule expounding controlling state law appears in Wray v. McMahon, 182 Miss. 592, 182 So. 99 (1938), in which the Court sustained a demurrer interposed by the Mayor and Commissioners of the City of Greenwood in a private action by a plaintiff allegedly injured by an unprovoked assault and battery committed upon him by two Greenwood policemen. Pointing out that employment of policemen was vested by statute solely in the Mayor and Commisioners acting as a governmental body, and not in any of them as individuals, the State Supreme Court held:

"This court, by several decisions heretofore rendered, has firmly committed itself to the rule, which generally prevails, that a governmental board or council, in the discharge of the duties imposed by law upon the board or council as such, acts in an official, and not in an individual capacity; and any neglect or failure in the exercise of its powers or in the discharge of its duties is the default of the board and not of the individuals composing it, and they are not liable for such neglect or default unless expressly made so by statute. State ex rel. Bank of Commerce & Trust Co. v. Forbes, 179 Miss. 1, 174 So. 67; Reese v. Isola State Bank, 140 Miss. 355, 105 So. 636; Pidgeon Thomas Iron Co. v. Leflore County, 135 Miss. 155, 99 So. 677, and the cases cited in those opinions."[19]

The significance between a ministerial and a discretionary act of a supervisor, as regards his personal liability, is controlled by the nature of the action brought against him. If it is a suit for the public benefit, liability will be personally imposed for dereliction in the performance of a ministerial act, as held

---

18. Particularly elucidative are the observations found in State ex rel. Bank of Commerce & Trust Co. v. Forbes, 1937, 179 Miss. 1, 174 So. 67, at p. 69:

"Board of supervisors are not mere ministerial agents of the state. Prior to the adoption of the State's Constitution of 1832 many of the duties now imposed on such boards were discharged by a county court. They appear in the judiciary articles of the Constitutions of 1832 and 1890, in the first under the name of boards of police * * * and in the second under their present name. * * * and are charged with duties judicial, legislative and executive; and in McNulty v. Vickery, 126 Miss. 341, 88 So. 718, it was expressly held that a member of the board of supervisors is not a ministerial, but is a quasi-judicial officer."

19. By statute, members of boards of supervisors are personally liable for: appropriation of money, for an object not authorized by law (§ 2944); the practice of nepotism (§ 4051); diversion of county bond proceeds (§ 2926–10); failure to comply with provisions as to publication of proceeds (§ 2889); withholding of county funds from the county tax collector (§ 3008); maintaining interest in public contracts (§§ 2301, 2302, 2920; Constitution § 109); failure to comply with provisions respecting county bonds (§ 4323); exceeding the county budget (§ 9118–10); maintaining interest in claim against county budget (§ 2313); and willful delay of presentations of any claim against the county budget (§ 9118–12).

in Walton v. Colmer, 169 Miss. 182, 147 So. 331, 148 So. 635, (1933), but not in a suit brought to redress private wrong. This question was definitely settled by People's Bank Liquidating Corporation v. Beashea Drainage Dist., 199 Miss. 505, 24 So.2d 784, (1946), in which drainage commissioners were sued by bondholders for the failure of the drainage district, in its corporate capacity, to assess additional benefits against lands in order to pay for the bonds that it issued. Very plainly the commissioners had failed to comply with ministerial duties imposed upon the drainage district by law, for the protection of its bonds, and individual liability was urged on the authority of First National Bank of Key West v. Filer, 107 Fla. 526, 145 So. 204, 87 A.L.R. 267, and similar authorities which are here cited by plaintiff. The Mississippi Supreme Court considered at length the wisdom of engrafting an exception on the general rule of nonliability of a board member, which had been left open in its earlier decision of State ex rel. Bank of Commerce & Trust Co. v. Forbes, supra. The issue was foreclosed in Mississippi against engrafting an exception in these words:

"The Court declined to express an opinion in the Forbes case as to whether such an exception should be recognized where a member of a board personally joins in and lends his efforts towards the accomplishment of the wrongful acts of the body or board itself as an entity, as held by the Florida Court. *Moreover, such an exception is contrary to the policy announced in our other decisions on the question; and especially where the suit is brought on behalf of private individuals.*" [20] (Emphasis added) People's Bank, etc. v. Beashea Drainage Dist., 24 So.2d, at 794.

Insofar as state law is concerned, the foregoing is dispositive of the non-liability of defendant-supervisors since this is a private action brought for personal injury and there is no statute which imposes personal liability upon supervisors for noncompliance with § 7904 or other statute relating to the operation and management of the county farm. Some cases have held that an immunity granted by state law will be respected in a § 1983 action.[21] It is unnecessary for us to align ourselves with that view since by the weight of federal authority, § 1983 immunity is granted to a state officer for his failure to perform a discretionary act as opposed to a mere ministerial duty.[22] Immunity for discretionary or quasi-judicial action, although first developed in suits against judges and later prosecutors, has been generally extended to legislative and administrative officials.[23]

20. See pertinent annotation in 123 A.L.R. 756, following the reported opinion of the Florida Supreme Court in Fidelity & Deposit Co. of Maryland v. Cone, 138 Fla. 804, 190 So. 268, 123 A.L.R. 750 (1939), collating authorities expressly rejected by the Mississippi Supreme Court as being contrary to the policy announced in its decisions, at least as pertains to a suit brought on behalf of a private party.

21. Zellner v. Wallace, 233 F.Supp. 874 (M.D.Ala.1964), citing Nesmith v. Alford, 318 F.2d 110 (5 Cir. 1963).

22. As held in Selico v. Jackson, 201 F. Supp. 475, 478 (S.D.Cal.1962):
"It is well settled that a public official is immune from civil suit based upon discretionary acts performed within the scope of his authority, regardless of the motives with which he performs his duties, and this immunity is not abrogated by the Civil Rights statutes." See, e. g., Dunn v. Estes, 117 F.Supp. 146, 148 (D.Mass. 1953); Sims v. United States, 252 F.2d 434, 441 (4 Cir. 1958); Taylor v. Glotfelty, 201 F.2d 51 (6 Cir. 1952); Cooper v. O'Connor, 70 App.D.C. 238, 105 F.2d 761, 763 (1939).

23. It is noteworthy, we think, that Mississippi was first to extend legislative immunity to legislators of all grades—e. g., members of boards of supervisors, city councilmen, etc., Jones v. Loving, 55 Miss. 109 (1877). For detailed analysis and annotation on the question of liability of officials, see excellent discussion in 2 HARPER AND JAMES, THE LAW OF TORTS, § 29.10, pp. 1638–1646 (1956), reading in part as follows (pp. 1641–42):
"The rule of immunity of officers for discretionary acts, and its extension repre-

As previously stated in this opinion, § 1983 did not "abolish wholesale all common law immunities". Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288, supra, p. 979; and "the immunity of legislators for acts within the legislative role was not abolished". Ibid. Cf. Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951).

As applied to the case at bar, while § 7904 imposes upon the Board a duty to promulgate regulations for the guarding of prisoners, it makes no attempt to dictate what regulations might be "proper"; and the only reasonable inference to be drawn therefrom is that the legislature intended that the Board have unfettered discretion in drawing what regulations it deemed proper.[24] We are clear that under any applicable federal law, county supervisors may not be held personally liable for failure to issue any regulations where, had they in fact issued certain regulations, they could not be held individually responsible for neglect of the Board in failing to provide regulations of such character as would reasonably protect the interest of the working convicts. Conceivably, regulations might have been established by the Board imposing the most exacting standards of proficiency in the use of firearms for one to be an armed guard, or which might have prescribed under what precise conditions a trusty could carry firearms, or again which might have altogether prohibited the use of convicts for armed guard duty. These matters go entirely to the exercise of judgment and

discretion; had the Board acted negligently in the adoption of imperfect regulations, there would be no liability because of the discretionary nature of the act. The Board's nonfeasance in the same area of discretion may lead to no different result. Liability under § 1983 is to be read "against the background of tort liability that makes a man responsible for the natural consequences of his actions." Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 484, 5 L.Ed.2d 492, supra, p. 981. In the final analysis, plaintiff cannot point to any individual act of a supervisor as having a causal relation to the subject matter of this litigation and the personal injuries sustained by plaintiff, and defendants who occupy the position of supervisors are entitled to be dismissed from the suit.

### III.

## LIABILITY OF SUPERINTENDENT ARTERBURY UNDER MISSISSIPPI LAW AND THE EIGHTH AMENDMENT

Under state law, John Arterbury, having custody of the county prisoners as farm superintendent, is under a plain legal duty to exercise ordinary and reasonable care under the circumstances of each particular case for the preservation of the life and health of those subject to his charge. This duty is the same as that imposed upon a county sheriff with respect to prisoners in the county jail. In Farmer v. State, 224 Miss. 96, 105, 79 So.2d 528 (1955), which rejected

---

sent a judgment that the benefits to be had from the personal liability of the officer (especially since the prospect of actual compensation to the victim from that source is slight) are outweighed by the evils that would flow from a wider rule of liability * * * [I]f personal liability may be visited upon officers who have acted in accordance with their apparent commands and their best judgment in these matters, we are likely to breed a race of do-nothing officials. The tendency is to protect the officer by regarding his function as quasi-judicial or discretionary."

24. The test for determining whether a particular act is ministerial or discretionary was well stated in Poyner v. Gilmore, 171 Miss. 859, 158 So. 922, 923 (1935), as follows:

"The most important criterion, perhaps, is that [if] the duty is one which has been positively imposed by law and its performance required *at a time and in a manner or upon conditions which are specifically designated*, the duty to perform under the conditions specified not being dependent upon the officer's judgment or discretion, the act in discharge thereof is ministerial." (Emphasis added)

the defense of immunity and imposed tort liability against the sheriff, the court aligned itself with the rule announcing a duty of ordinary care in these terms:

"When a sheriff, by virtue of his office, has arrested and imprisoned a human being, he is bound to exercise ordinary and reasonable care, under the circumstances of each particular case, for the preservation of his life and health. This duty of care is one owing by him to the person in custody by virtue of his office, and for a breach of such duty he and his sureties are responsible in damages on his official bond."

Although Miss.Code Ann. § 7915 was not directly mentioned in the foregoing case, the terms of the statute require nothing less than a standard of proper care under the circumstances.[25] This accords with the general rule to the effect that a jailer must exercise reasonable and ordinary care and diligence to prevent unlawful injury to a prisoner placed in his custody, that he cannot be charged with negligence in failing to prevent what he could not reasonably anticipate, but he is responsible for the consequences of his own neglect. 41 Am.Jur., Prisons and Prisoners, §§ 12 and 13, pp. 893–94. City of Topeka v. Boutwell, 53 Kan. 20, 35 P. 819 (1894); Peters v. White, 103 Tenn. 390, 53 S.W. 726 (1899); Lamb v. Clark, 282 Ky. 167, 138 S.W.2d 350 (1940). See Anno. 46 A.L.R. 114, and 61 A.L.R. 566.[26]

■■■■■ While prison administration and methods of handling prisoners are matters largely committed to the institution's custodian and are not to be critically reviewed by courts in the absence of manifest breach of duty of ordinary care, it remains that the custodian cannot act in a way that exposes others unnecessarily to danger. We pretermit a consideration of whether in this modern age the use of inmates as armed guards comports with best prison standards, for it has not been shown that the trusty system is necessarily injurious to prisoners' welfare. The more limited inquiry here is whether Arterbury exercised requisite degree of care when he decided to make Williams a trusty and furnished him with firearms for duty as an armed guard. In making that decision, Arterbury was bound to exercise care commensurate with the dangerous nature of the article being turned over to Williams; and to fail to exercise that degree of care would be Arterbury's personal dereliction, for he might have reasonably foreseen the consequences of likely injury to another prisoner if the shotgun were in the hands of an untrained, incompetent guard, or one who was ignorant as to its safe and proper use. The rule in Mississippi with respect to handling of loaded firearms imposes the highest degree of care, as was enunciated in State, to Use of Johnston v. Cunningham, 107 Miss. 140, 65 So. 115, 118, 51 L.R.A.,N.S., 1179 (1914):

The highest degree of care is exacted of a person handling firearms. They are extraordinarily dangerous, and in using them extraordinary care should be exercised to prevent injury to others. * * * A high degree of care is necessary in the use or manipulation of

---

25. Additionally, Miss.Code Ann. § 7915 (1942 Recomp.) provides that:
"An official, or guard, or other employee having the custody of any county prisoner, or any official or employee of the county having the custody of any county prisoner, who shall maltreat or abuse any such convict, or who shall knowingly permit the same to be done * * * shall be deemed guilty of a misdemeanor * * *."

26. The last annotation includes an opinion by the Kentucky Court of Appeals in Ratliff v. Stanley, 224 Ky. 819, 7 S.W.2d 230, 61 A.L.R. 566 (1928), which contains the following statement:
"In all of these cases the liability of the jailer for such injuries is recognized where he had reasonable ground to apprehend the danger to the prisoner. The law imposes the duty on a jailer to exercise reasonable and ordinary care and diligence to prevent unlawful injury to a prisoner placed in his custody, but he cannot be charged with negligence in failing to prevent what he could not reasonably anticipate."

loaded weapons in the presence or vicinity of other persons, and where injury results from a failure to exercise such care, the defendant is liable. * * * The bearer of loaded firearms is bound to exercise the utmost diligence in their handling, and he is liable for any injury caused by their discharge, unless it appears that he was entirely without fault. * * * "

The language of the Mississippi Supreme Court is but a refrain of the law generally. "Some courts refer to the degree of care [in the handling of a firearm] required as a high degree of care; others say that the utmost or highest degree of of care must be used to the end that harm may not come to others. More often, the requisite degree of care is defined as such care as is commensurate with the dangerous nature of the firearm." 56 Am.Jur., Weapons and Firearms, § 23, p. 1006.

■ Another applicable principle is that relating to consequences flowing from negligent allowance for a third person to use an instrumentality where the actor knows or should know that such third person is likely to use that instrumentality in a way to create a reasonable risk of harm to another person. Restatement of the Law of Torts, § 308, declares:

"It is negligent to permit a third person to use a thing or to engage in an activity which is under the control of the actor if the actor knows or should know that such person intends or is likely to use the thing or to conduct himself in the activity in such a manner as to create an unreasonable risk of harm to others. * * * The rule stated in this Section has its most frequent application where the third person is a member of a class which is notoriously likely to misuse the thing which the actor permits him to use.

Thus, it is negligent to place loaded firearms or poisons within reach of young children or feeble-minded adults." Accord, Lovett Motor Co. v. Walley, 217 Miss. 384, 64 So.2d 370 (1953).

■ If we were confronted solely with negligence, or even recklessness on the part of Williams, the trusty, without any evidence indicating Arterbury's personal neglect, obviously Arterbury would not under those conditions be chargeable with Williams' conduct because, here again, the doctrine of respondeat superior does not apply.[27] The evidence, however, clearly points to failure on the part of Arterbury himself in using care measured either in terms of the highest degree or in terms of ordinary care under the circumstances, in turning over to Williams a loaded gun without making certain that Williams was competent to handle it. Cursory questioning of Williams as to whether he understood how to handle a shotgun was wholly inadequate to satisfy a duty in dealing with a dangerous instrumentality. As we view the evidence, the instructions given by Arterbury were meager at best, and in no way did he ascertain Williams' proficiency in handling the weapon either respecting marksmanship or safety measures. No heed was paid to well known and important safety measures in handling a gun. Williams was not told to recheck the safety mechanism at every manipulation of the gun, never to point the shotgun in any direction or at any object at which he was not ready to fire. Since the shooting in this case occurred under the most needless and avoidable circumstances, it is patent that Williams was thoroughly ignorant—indeed incompetent—in the handling of a firearm. It was Arterbury's duty to exercise care that Williams knew how to use the gun

27. See, e. g., Lunsford v. Johnston, 5 Tenn. C.C.A., aff'd 132 Tenn. 615, 179 S.W. 151, 11 N.C.C.A. 638 (1915) ; Hale v. Johnston, 140 Tenn. 182, 203 S.W. 949 (1918) ; Kebert v. Board of County Commissioners, 134 Kan. 401, 5 P.2d 1085 (1931) ; Fernelius v. Pierce, 22 Cal.2d 226, 138 P.2d 12 (1943) ; Metoyer v. Holman, 358 F.2d 110 (5 Cir. 1966); Martinez v. Cahill, 215 Cal.App.2d 823, 30 Cal.Rptr. 566; St. Julian v. State, La.App., 98 So.2d 284 (1957).

and could handle it safely before giving him possession of it, instructing him to use it in guard duty and to keep it ready for firing at any moment. If the gun had to be ready for firing at any moment, as Arterbury instructed Williams to have it, all the greater would be the degree of care necessary to be exercised by Arterbury in giving of minute and detailed safety instructions to Williams or anyone else handling a loaded weapon under such circumstances. We absolve Arterbury of plaintiff's charge that Williams was morally unfit to be an armed guard, as we are not convinced that Williams was a person of murderous and malicious instincts, but we cannot absolve Arterbury of his own negligence in delivering a loaded firearm to a person ignorant with respect to its safe handling. The negligence of Arterbury in this respect, combined with the negligence of Williams in mishandling the gun, produced a classic case of causation which proximately resulted in the shooting of and personal injuries to plaintiff. It is no answer to say, under these circumstances, that Columbus Williams alone is responsible for the consequences of his negligence, but that responsibility must be shared by Arterbury because of his own concurrent, tortious conduct.[28]

▆▆▆ Finally, Arterbury, as a public official in charge of the county farm,

has no state-recognized immunity from suits in tort and, as heretofore discussed, should Leflore County see fit in its discretion, under Miss. Code Ann. 4049.5, to pay a judgment against Arterbury, that would not convert this action into a suit against the county.

▆▆▆ Having concluded Arterbury is liable under state law, we are clear in the view that liability likewise exists under § 1983. It is an established principle that a person confined in a state or county prison is within the protection of 42 U.S.C. § 1983, and the right of a state prisoner to be free from cruel and unusual punishment, or to be within the protection of the Eighth Amendment, is one of the rights that a state prisoner may, in a proper case, enforce under § 1983. Jordan v. Fitzharris, 257 F.Supp. 674 (N.D.Cal.S.D. 1966).[29]

▆▆▆ It is equally well settled that Arterbury, holding the public office of county farm superintendent, was acting under color of state law within the meaning of § 1983. With the plaintiff having the protection of the statute and Arterbury being subject to its terms, the only question remaining is whether the plaintiff has shown the violation of a federally protected right, or that he has been subjected "to the deprivation of any rights, privileges, or immunities

---

28. See, e. g., American Creosote Works of Louisiana v. Harp, 215 Miss. 5, 60 So.2d 514, 35 A.L.R.2d 603 (1952); Planters Wholesale Grocery v. Kincade, 210 Miss. 712, 50 So.2d 578 (1951); Gulf Refining Co. v. Brown, 196 Miss. 131, 16 So.2d 765 (1944); Brewer v. Town of Lucedale, 189 Miss. 374, 198 So. 42 (1940); see also, Annot., 38 Am.Jur., Negligence, § 63, p. 715, 100 A.L.R.2d 989.

29. In Jordan v. Fitzharris, the Court said at p. 679:
"The Civil Rights Act, 42 U.S.C. § 1983, creates a cause of action for deprivations, by persons acting under color of state law, of rights secured by the Constitution. See Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

Persons confined in state prisons are within the protection of 42 U.S.C. § 1983. See Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); Weller v. Dickson, 314 F.2d 598 (9th Cir. 1963); Stiltner v. Rhay, 322 F.2d 314 (9th Cir. 1963). The right to be free from cruel and unusual punishment is one of the rights that a state prisoner may, in a proper case, enforce under § 1983. Talley v. Stephens, 247 F.Supp. 683 (E.D.Ark.1965); United States ex rel. Hancock v. Pate, 223 F.Supp. 202 (N.D.Ill.1963); Redding v. Pate, 220 F. Supp. 124 (N.D.Ill.1963); Gordon v. Garrson, 77 F.Supp. 477 (E.D.Ill.1948); Lee v. Tahash, 352 F.2d 970, 972 (8th Cir. 1965)."

secured by the Constitution and laws of the United States." This brings up for direct analysis the scope of the Eighth Amendment, which is applicable to the states and state officers.[30] In 1910, the United States Supreme Court declared that "what constitutes a cruel and unusual punishment has not been exactly decided", Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910), and the observation has been made that that statement is as true today as it was in 1910. Jordan v. Fitzharris, supra. A pertinent inquiry has always been for a court to ask whether under all the circumstances the punishment in question is of such character as to shock general conscience or be intolerable to fundamental fairness. "Unlawful [prison] administration can exist where there are aspects of institutional treatment of such character or consequences as to shock general conscience or to be intolerable in fundamental fairness. Such treatment is entitled to be held to be within the ban of the Eighth Amendment as representing cruel and unusual punishment and so constituting unlawful administration of prison sentence. It may be observed in this connection that penal admeasurements made by general conscience and sense of fundamental fairness doubtless will not be without some relationship to the humane concepts and reactions of present-day social climate." Lee v. Tahash, 352 F.2d 970, 972 (8 Cir. 1965).[31]

 Imprisonment under the extra hazardous conditions to which plaintiff was needlessly exposed, and which culminated in permanently maiming and totally disabling him, was so severe and shocking to the conscience, and so utterly disproportionate to the crime—petty larceny for taking of articles of the retail value of $2.11—as to constitute cruel and inhuman punishment. It is not that the armed trusty system is to be viewed as "cruel and unusual" in itself, but rather the unprovoked, grossly negligent shooting of a prisoner by one negligently entrusted with firearms that violates the constitutional right. Indeed, it is our view that the moral sense of all reasonable men of this day would be shocked by the punishment visited upon the plaintiff, yet a minor, as a direct result of inattentive and careless prison administration.

 Liability against Arterbury having been established, there remains our duty to assess compensatory damages in fair and reasonable amount to plaintiff, Arthur Roberts, in this action brought directly for his own benefit. As previously noted,[32] plaintiff, because of the shooting, has lost the sight of both eyes, and has recurring headaches, occasional fainting spells and probable brain damage. With a life expectancy of almost 50 years, he will be totally disabled as long as he lives. Correct determination of legal damages is not without its difficulty, particularly since no proper proof of damage has been made for the apparently considerable accrued hospital, medical, nursing and other special services rendered plain-

---

**30.** Eighth Amendment to the Constitution of the United States:

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

**31.** In Jordan v. Fitzharris, supra, 257 F. Supp., at page 679, the Court said:

"The first approach is to ask whether under all of the circumstances the punishment in question is 'of such character * * * as to shock general conscience or to be intolerable to fundamental fairness.' * * * Such a judgment must

be made in the light of developing concepts of elemental decency. * * * Secondly, a punishment may be cruel and unusual if greatly disproportionate to the offense for which it is imposed. * * * Finally, a punishment may be cruel and unusual when, although applied in pursuit of a legitimate penal aim, it goes beyond what is necessary to achieve that aim; that is, when a punishment is unnecessarily cruel in view of the purpose for which it is used."

**32.** See fn. 9, page 977, of this Opinion.

tiff over a period of many months,[33] nor has the plaintiff, fourteen years old at the time of the accident, been able to show a history of earnings or establish loss of probable earning power or what might be prospective loss of earnings. Nevertheless, substantial recovery is not to be denied an injured minor because of his inability to show present earnings where the evidence, as here, fully justifies such an award. 22 Am.Jur.2d, Damages, § 101, p. 148. It is reasonable to conclude that, upon attaining his majority, plaintiff would have been able to perform ordinary employment, qualifying him for minimum wages under a 40-hour week, and that his injuries have deprived him of this ability to earn a living for the rest of his life and rendering him a charge upon the public, absent a fair recovery in this case. During the four years since this accident occurred, plaintiff has experienced great physical pain and suffering and also untold mental agony, embarrassment and humiliation; and he will indefinitely continue to endure both physical suffering and mental anguish. His incapacity borders upon personal helplessness in many ways and he will require, for an indeterminate period of time, special care and assistance from others who are entitled to be reasonably compensated for their service. After full consideration of each element of proven damage and the extent and nature thereof, the court concludes that the minor plaintiff is entitled to recover from defendant Arterbury the sum of $85,000 and all costs of this action.

Judgment in accordance with this Opinion will be entered this date.

33. This may be due to the fact that such expenses may have already been paid by the county. In any event, independent claims by Eddie Roberts, father and sole surviving parent, for recovery of medical expenses and reduced earning capacity of plaintiff during his minority have been waived since Eddie Roberts brought suit for the minor plaintiff as father and guardian. Anderson v. Jenkins, 220 Miss. 145, 70 So.2d 535 (1954), medical expenses; Brookhaven Lumber & Manufacturing Co. v. Adams, 132 Miss. 689, 97 So. 484 (1923), reduced earning capacity during minority.