Arthur **ROBERTS**, by his Father and Guardian, Eddie W. Roberts, Plaintiff-Appellee-Cross Appellant,

v.

Columbus **WILLIAMS**, Individually and as Trusty at the Leflore County Farm, et al., Defendants-Cross Appellees,

John Arterbury, Defendant-Appellant-Cross Appellee.

No. 28829.

United States Court of Appeals, Fifth Circuit.

April 1, 1971.

Certiorari Denied Oct. 12, 1971.

See 92 S.Ct. 83.

Addendum April 1, 1972.

Simpson, Circuit Judge, filed a specially concurring opinion.

R. C. McBee, Bell & McBee, Ulysses A. Smith, W. J. Lipscomb, Robert H. Swanzy, James D. Green and James M. Hooper, Jr., Greenwood, Miss., for cross appellees.

Stanny Sanders, Travis H. Clark, Jr., H. D. Brock, Greenwood, Miss., for John L. Arterbury.

Donald R. Wilson, John J. Haugh, Portland, Or., Martha M. Wood, Lawyers Committee for Civil Rights Under Law, Jackson, Miss., Lawrence D. Ross, Jackson, Miss., for appellee cross-appellant.

Frank Pozzi, Pozzi, Wilson & Atchison, Portland, Or., James Robertson, Lawyers' Committee for Civil Rights Under Law, Jackson, Miss., for Arthur Roberts.

Before RIVES and SIMPSON, Circuit Judges, and NICHOLS, Judge of the Court of Claims.*

NICHOLS, Judge:

This is a civil action for damages with Federal jurisdiction asserted under the Civil Rights Act of 1871, R.S. § 1979, 42 U.S.C. § 1983, which reads as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction

---

* Sitting by designation as a member of this panel.

thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

On April 15, 1965, plaintiff, then fourteen years of age, pled guilty in the City Court of Greenwood, Mississippi, to a charge of petty larceny, and was sentenced to ninety days at the Leflore County Farm. On June 28, 1965, plaintiff was among a group of prisoners performing work on the county roads. A shotgun in the hands of a trusty guard, defendant Williams, discharged into plaintiff's face, causing the loss of both eyes, brain damage and other injuries.

He brought this suit in the District Court, by his father and guardian, alleging a Federal cause of action under § 1983, *supra*, in that he had been caused to suffer "cruel and unusual punishment" in violation of his rights under the Eighth Amendment to the Constitution of the United States, as extended to states by the Fourteenth. He also invoked the "pendent" jurisdiction of the District Court to hear a claim for negligence under state tort law. The named defendants pertinent to this appeal were John Arterbury, then Superintendent of the Leflore County Farm, and the individual members of the Board of Supervisors of Leflore County. Columbus Williams was also sued but plaintiff was unable to obtain personal service of process upon him. Actions against other named defendants were dismissed.

After trial without a jury, the District Court dismissed the action against the members of the Board of Supervisors on immunity grounds, but found defendant Arterbury liable under both Federal and state law and awarded plaintiff a judgment against him in the amount of $85,-000. The opinion reported 302 F.Supp. 972 (1969) includes the fact findings. The case is now before us on Arterbury's appeal and plaintiff's cross-appeal from the dismissal against the Supervisors, and on the adequacy of the damages.

## I.

## Liability of Arterbury

Defendant Arterbury had served at the County Farm, either as assistant superintendent or as superintendent for a period in excess of 18 years. He was employed from year to year by the County Board of Supervisors pursuant to statute, Miss.Code Ann. § 7901, requiring them to "employ a competent and suitable person * * * to superintend such convict farm, and manage it and to work the convicts sentenced to the County Jail thereon." The work required of the inmates was performed either at the farm itself or, under authority of Miss.Code Ann. § 7904, "on the public roads of the county." The Board had issued no orders or regulations to govern such working of the convicts as was required by the statute, but members of the Board visited the Farm frequently and had for many years signified their approval of the way Arterbury did things by tacit acquiescence. They regarded him as of good reputation and well qualified for his post. Another practice of long standing, though apparently without statutory authority, was the use of convicts as armed "trusty guards," the purpose being to save the pay of regular guards. Only one paid guard was employed. The Board did not provide express authorization for or regulations to govern this practice, but it was carried on with their knowledge and tacit approval.

During the time in question, defendant Arterbury had selected as a trusty guard Columbus Williams, a 23 year old man with a 4th grade education, who had been convicted of assault with intent to kill, and later of theft. Despite Williams' record, the trier of fact was not convinced that he was "a person of murderous and malicious instincts." 302 F.Supp. at 988. Arterbury's chief reason for selecting Williams was that "he was obedient, did his work right and never gave me any trouble." He made no minimal effort to instruct Williams in the use of the weapon with which he was armed, a 12 gauge

pump shotgun. He relied on Williams' affirmation that he had handled one. He told Williams, he testified, to be careful, to keep the safety on, and to put a shell in the chamber when they reached the work site. On June 28, 1965, plaintiff was among a group of prisoners who were working one of the county roads near Morgan City. Columbus Williams, armed with his shotgun, was present in his capacity as trusty guard. During a lunch break, the foreman, who was not a convict, left the scene, leaving Williams in charge. Williams was standing with the shotgun cradled under his right arm at a distance of no more than 50 feet from plaintiff, who was at rest on the ground. The gun discharged directly at plaintiff causing the injuries here complained of. The trial court, in its very able opinion found:

> * * *. Admittedly, at the time of the shooting Williams had the shotgun loaded with 5 shells, one of which was in the firing chamber, ready to shoot in accordance with his instructions, and the safety was off. The shotgun could not have been discharged with the safety on, as it was in good working order. There is no evidence that Williams stumbled or dropped the gun or suddenly knocked the safety off. Williams was unable to give a satisfactory explanation of why the gun discharged and he failed to check the safety mechanism after its discharge. * * * 302 F.Supp. at 987.

While concluding that Williams was "patently incompetent" in handling firearms, the trial judge specifically rejected plaintiff's suggestion that the shooting was intentional. Williams maintained it was accidental. The suggestion, indeed, lacked support in substantial evidence and was inherently incredible. No reason or adequate motive appears why Williams should commit such a crime, and in plain view of several witnesses, at a time when plaintiff, reclining on the ground, offered no shadow of an excuse to fire.

The court held that Williams' conduct constituted gross negligence but determined that the doctrine of *respondeat superior* could not be applied to hold Arterbury personally liable. We are not so sure that such is the law in Mississippi. None of the cases cited below are from Mississippi courts and in the one decision of this court cited, Metoyer v. Holman, 358 F.2d 110 (5th Cir. 1969), there is no indication that liability on the basis of *respondeat superior* was asserted. The action was under diversity jurisdiction. Plaintiff, a prisoner, was shot by a guard while attempting to escape. The trial court was held right in directing a verdict for the warden, because no negligence by him personally was shown. For a split of authority as to this see the annotation at 14 A.L.R.2d 353. However, we are not called upon to decide this issue now because we agree that Arterbury's liability is based on his own negligence.

■ The trial court, citing Farmer v. State, 224 Miss. 96, 79 So.2d 528 (1955), held that under state law, Arterbury owed a duty to the prisoners in his charge to exercise ordinary and reasonable care to protect them from unnecessary harm and for the preservation of their life and health. It is an on point citation. Farmer v. State, holds a sheriff and a jailor personally liable for the death of a prisoner in their care, because he was denied the medical attention he needed for a case of stomach ulcers. Specifically, the fact finding in this case was:

> * * *. Arterbury gave Williams only the briefest instructions concerning the use of the gun, telling him "to be careful". There were no meaningful demonstrations by Arterbury or his assistants to teach Williams the use of the gun or its safe handling, or to make certain that he was competent for guard duty. Specifically Williams was not instructed, at all costs, never to point the shotgun in any direction or at any object at which he was not ready to fire, nor was he instructed to, at all times, examine the safety to determine that it had not become dislodged. But Arterbury did instruct Williams to in-

ject a shell into the firing chamber whenever the work crew had reached the area where guard duty would commence. So far as is known, prior to the shooting, Williams had never shot the gun in target practice, nor had he at any time received expert instruction as to its care and handling. * * * 302 F.Supp. at 978.

* * * * * *

* * *. Since the shooting in this case occurred under the most needless and avoidable circumstances, it is patent that Williams was thoroughly ignorant —indeed incompetent—in the handling of a firearm. * * *. The negligence of Arterbury in this respect, combined with the negligence of Williams in mishandling the gun, produced a classic case of causation which proximately resulted in the shooting of and personal injuries to plaintiff. * * * 302 F.Supp. at 988.

Although there are cases holding to the contrary in other jurisdictions, Bush v. Babb, 23 Ill.App.2d 285, 162 N.E.2d 594 (1959), defendant does not dispute that Farmer v. State, *supra,* is the law in Mississippi. For a discussion generally of the duty owed by a sheriff or other officer to prisoners in his custody see the annotation at 14 A.L.R.2d 353 and cases cited therein. The consequences of Arterbury's conduct here is not unlike that of the defendant in Asher v. Cabell, 50 F. 818 (5th Cir. 1892), where our predecessors held:

> * * *. That a United States marshal may take prisoners into his custody, permit them to be disarmed and shackled, and then negligently and knowingly deliver them over to incompetent deputies and the known hostility of mobs, without liability for his neglect of duty, is a proposition which we think cannot be sanctioned. * * * 50 F. at 827.

We cannot agree with defendant's assertion that finding him negligent under the circumstances was against the weight of the evidence. We think the evidence amply supports such a finding, and in-

deed, we could overturn it only if it were "clearly erroneous", F.R.Civ.P. 52 (a), 28 U.S.C.A., Smith v. United States, 287 F.2d 299 (5th Cir. 1961). In this regard see further our discussion, *infra,* of Arterbury's liability under the Civil Rights Act.

The record reflects a clear-cut breach of legal duty by Arterbury. The trusty guard system, of course, was not instituted by him and we need not decide whether he can be blamed for that. Within that system, the Supervisors relied entirely on him to select and train suitable persons to be trusty guards. Williams' criminal record, which would have been all important in a case of intentional shooting, of course is a minor factor here, except, perhaps as reflecting a callous and indifferent state of mind on Arterbury's part. In view of the finding of accidental shooting, it is the failure to train and supervise that is decisive. The trial judge had before him uncontradicted expert testimony that in case of a person armed and placed as a guard over prisoners, training in the safe care and use of his weapon is the first and most essential type of training he must receive. This is even more true when as in this case, the guard is ordered to keep the gun loaded and ready for immediate firing. The gun was proved to have been in good order, such that it would not have fired if the safety had been on as it should have been. All other explanations of the catastrophe being eliminated, the only one remaining is that it fired because of Williams' improper handling of it, and the proximate cause of that, his goodwill being assumed, was the lack of necessary instruction.

■ Arterbury's chief contention, however, is that the issue of his negligence in failing properly to instruct Williams in the handling of a shotgun was placed before the court too late. He cites as error the introduction over his objection, of any evidence relating to Williams' negligence. This is so, he says, because the trial court, on the day the trial began, allowed plaintiff to amend his pleadings without granting a con-

tinuance to Arterbury. Plaintiff's original petition read in pertinent part as follows:

20. On or about June 28, 1965, [plaintiff] again worked under the supervision and control of defendant COLUMBUS WILLIAMS in road work at Morgan City, Leflore County. During the luncheon break, while [plaintiff] was lying on the ground resting, defendant COLUMBUS WILLIAMS * * * *intentionally* leveled his shotgun into [plaintiff's] face, knowing the same to be cocked and loaded, with reckless and wanton disregard of the consequences and of [plaintiff's] rights under the laws of Mississippi and the laws and Constitution of the United States. (Emphasis supplied.)

21. Defendant COLUMBUS WILLIAMS thereupon shot [plaintiff], the buckshot striking him in the face, head and breast. The discharge of the shotgun and the mutilation of [plaintiff] were reasonably foreseeable consequences, of which defendant COLUMBUS WILLIAMS knew or should have known, of the unlawful and unjustified threat *intended* by WILLIAMS when he *intentionally* pointed into [plaintiff's] face a shotgun known by him to be cocked and loaded. (Emphasis supplied.)

On February 18, 1969, the date the trial commenced, plaintiff was allowed to amend his pleadings to add the phrases "or negligently" to the term "intentionally" in paragraphs 20 and 21, and to replace the word "intended" in paragraph 21 with the word "presented". Counsel for plaintiff explained that he had learned only two months prior, during the taking of Columbus Williams' deposition, that Williams considered the shooting unintentional. Defendant was present with counsel during the taking of that deposition but declined to cross-examine Williams. Arterbury's counsel contended that "proceeding with this suit on the basis of negligence changes the entire complexion of this suit as set up in the original complaint", and moved for a continuance. The court denied defendant's motion in the following language:

Gentlemen, I am of the opinion that this amendment is just simply adding a descriptive adverb, it is not changing the allegations of the case at all. The defense, as I see it, and it has been pleaded for many months, is that this shooting was an entirely nonnegligent, accidental one. The plaintiff's case is contrary, that it was a negligent, tortious shooting. In order for the plaintiff to get the benefit of all acts of negligence it is the opinion of this court that the amendment is quite unnecessary. However, the amendment will be allowed. * * *, and no continuance or delay will be granted in the trial. I do not see that this can operate in any respect whatsoever to the surprise of the defendants. Tr. p. 14.

Arterbury does not object to the allowance of the amendment, only to the denial to him of a continuance. F.R.Civ. P., Rule 15(b), reads in part as follows:

* * *. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

The granting or denial of a continuance, like the granting or denial of a motion to amend, lies in the discretion of the trial judge. "And this discretion will not be disturbed unless it is abused." Heay v. Phillips, 201 F.2d 220, 14 Alaska 132 (9th Cir. 1952); Girard Trust Co. v. Amsterdam, 128 F.2d 376 (5th Cir. 1942). The trial judge's statement, *supra*, denying the continuance, indicates he considered all the aspects of the case including the pleadings themselves, pretrial conferences, and discovery avail-

able to the parties, in concluding that defendant Arterbury could not be surprised by the amendment. Arterbury's brief lists several things he says he could have done "to prepare a defense on this issue which he could not do after trial had begun", i. e., take a further deposition from Williams. However, we find it very significant that in his motion for a new trial submitted on August 7, 1969, Arterbury simply cited as error the failure to grant a continuance and the finding that he was negligent. There was no offer then made of any new evidence, failing which a new trial could only have resulted in the same verdict. Our conclusion is that Arterbury has failed to demonstrate that he was prejudiced by the amendments and therefore the trial judge was within his sound discretion in denying the continuance.

Arterbury next argues that the trial court could not lawfully have found him liable under § 1983 because, "the record in this case is totally void of any conduct on the part of Arterbury that deprived the plaintiff of any Federally protected right." He does not challenge the trial court's finding that he was clearly acting under color of state law. Nor does he dispute the proposition that a prisoner incarcerated in a state penal institution is entitled to the protection of the Eighth Amendment and to that end may sue under § 1983. What he does say is "that the nature of the conduct attributed to Arterbury in the instant case has never been held actionable under the Civil Rights Act." Citing Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), he urges us to consider his motives because "to do otherwise would result in a gross distortion of the Civil Rights Act so that a federal claim would arise any time a person acting under color of law is in any way responsible for an injury to a citizen". In this regard, he equates his own conduct with that of "the jailor who accidently shuts the cell door on a prisoner's hand." For a case holding a deputy liable under tort law for closing a cell door on a prisoner's thumb, see

Davis v. Moore, 215 N.C. 449, 2 S.E.2d 366 (1939). In support of this contention, we are cited to Kent v. Prosse, 265 F.Supp. 673, 674 (W.D.Pa.), aff'd 385 F. 2d 406 (3d Cir. 1967), where the court said:

> An unintentional common law tort does not deprive an injured person, be he prisoner or not, of any constitutional rights secured or guaranteed by the Fourteenth Amendment or the laws of the United States.

However, this dictum goes beyond the issues. In that case, the plaintiff was injured by defective machinery on which he was working and there was no allegation of cruel and unusual punishment or any other federally protected right, rather, the allegation was that plaintiff was deprived of his "right not to be injured". The court held and rightly, 265 F.Supp. at 674, that:

> * * * nowhere have we found authority for the proposition that such right is a constitutional right, or is guaranteed by a law of the United States. Deprivation of civil rights is not aimed at common law negligence, but at deprivation of rights secured by the Fourteenth Amendment, * * *.

Here, the allegation is clearly that plaintiff was deprived of "rights, privileges and immunities secured to him by the Fourteenth Amendment of the United States Constitution, including * * * the right not to suffer cruel and unusual punishment". (Paragraph 24 of plaintiff's complaint.) And there are sufficient facts alleged, which if proved, support such a conclusion.

Defendant's reliance on Pierson v. Ray, *supra,* as authority for the weight we should give to his motives is misplaced, as should be obvious from a reading of this court's opinion in Whirl v. Kern, 407 F.2d 781 (5th Cir.), cert. denied, 396 U.S. 901, 90 S.Ct. 210, 24 L.Ed.2d 177 (1969); and a case from the seventh circuit, Joseph v. Rowlen, 402 F.2d 367 (7th Cir. 1968): In the latter case, the complaint alleged an arrest and detention without probable cause and without a warrant. The court, citing Monroe v.

Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed. 2d 492 (1961), reversed prior decisions in that circuit which had held that a section 1983 action on such a cause must allege a systematic policy of discrimination against a class or group of persons, and held that the complaint stated a good cause of action. The court, distinguishing *Pierson,* specifically rejected a "good faith" argument, 402 F.2d at 369, in the following language:

> * * *. The formulae suggested at times for distinguishing causes of action which are cognizable in federal court from those which are not have usually required for a federal cause of action facts indicating flagrancy or an improper motive.

One serious difficulty with such formulae is that there is nothing in the language of sec. 1983, or the fourth and fourteenth amendments as presently construed, on which to base such tests.

Although the Supreme Court has found that certain defenses to a sec. 1983 cause of action exists, apparently by implication, they are defenses typical of tort causes of action. * * *

■ The springboard for tort actions under section 1983 is found in Monroe v. Pape, *supra,* 365 U.S. at 187, 81 S.Ct. at 484, where Mr. Justice Douglas wrote that section 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." We had occasion to give effect to that language most recently in Whirl v. Kern, *supra,* where as a result of the "custodial derelictions" of the sheriff, the plaintiff was kept incarcerated for almost nine months after charges against him had been dismissed. In reference to the words of Justice Douglas, quoted *supra,* we said, 407 F.2d at 787:

> * * *. We do not find in this language or in the language of the Act itself any intimation that an invasion of constitutional rights unaccompanied by an improper motive lies beyond the reach of the Statute.

In reference to other language of that case found at 365 U.S. 180, 81 S.Ct. 480, we said, 407 F.2d at 788:

> The Supreme Court's use of the term "neglect" and the expansive phrase "or otherwise" appears to us directly contrary to the "improper motive" requirement. Such language suggests that a federal forum is no less desirable for the inadvertent than for the malicious violation of constitutionally protected rights. * * *

We held that where good faith would be a defense to the tort itself, then it could be pleaded as a defense to the section 1983 action based on that tort. We made it clear, however, that the origin of the good faith defense was "in the common law of torts not in the Civil Rights Act". The tort action here is based on negligence and defendant has not shown us any case where good faith was a valid defense to a negligence action. According to Prosser, "the standard imposed by society is an external one, which is not necessarily based upon any moral fault of the individual, and a failure to conform to it is negligence". Prosser, Law of Torts, p. 148, 3d Ed. 1964. We therefore reaffirm our holding in Whirl v. Kern, that improper motive is not a prerequisite to suit under section 1983.

Arterbury also urges the contention that cruel and unusual punishment cannot result from "mere negligence", and he argues that "the conduct of the state official which has been held as actionable under section 1983, has in every case been of an overt or affirmative nature". This contention ignores the circumstances of Whirl v. Kern, where the conduct of the defendant, without a doubt, constituted a sin of omission. But that case did not rest on the Eighth Amendment. We held there that the allegation of ignorant failure of the sheriff to release the prisoner for nine months after the termination of all proceedings constituted a good cause of action under section 1983. Defendant refers us to nothing in the literature of the law which defines "mere negligence".

Negligence, according to the Restatement, Second, Torts, § 282, is conduct "which falls below the standard established by law for the protection of others against unreasonable risk of harm". In Prosser, *supra,* at pp. 183–84, we are told:

> The amount of care demanded by the standard of reasonable conduct must be in proportion to the apparent risk.
> * * *
>
> * * * * * *
>
> * * *. What is required is merely the conduct of the reasonable man of ordinary prudence under the circumstances, and the greater danger, or the greater responsibility, is merely one of the circumstances, demanding only an increased amount of care.

We make no attempt here to set standards for defining cruel and unusual punishment under the Eighth Amendment.

> "Just what constitutes cruel and unusual punishment in the constitutional sense is a matter which defies concrete definition. However, it has long been understood that the concept of cruel and unusual punishment is one of wide application, capable of acquiring new depths of meaning to conform to more enlightened concepts of criminal justice."

Hancock v. Avery, 301 F.Supp. 786, 791 (M.D.Tenn.1969). For an enlightening discussion of this subject, see the opinion of then Judge, now Justice, Blackmun, in Jackson v. Bishop, 404 F.2d 571 (8th Cir., 1968).

▆ Though not the only provision of the Bill of Rights safeguarding prisoners, the Eighth Amendment is the primary one, and there is no reason for it to fall short of the prisoners' needs. The defendant's argument poses a problem, however, in that one's semantic versatility does boggle at the task of bringing a case such as the accidental closing of a cell door on a prisoner's hand (*vide, supra,*) under the rubric of a cruel and unusual punishment, however negligent it may have been. The act may cause the prisoner great pain and suffering,

and be highly reprehensible, but what is lacking is a specific intent to be cruel. This intent may exist, however, coincident with the loftiest purposes. *Vide,* in history, Torquemada. We suppose the jailors in Jackson v. Bishop did not say, before using the strap on a prisoner: "Let us now be cruel." More likely they deemed it for the prisoner's own good. Thus the emphasis on good intent *per se* as an exonerating factor is misplaced. We also think the District Judge's contrast between the petty nature of plaintiff's offense, theft of $2.11 worth of groceries, and his being blinded, maimed and disabled for life, (302 F.Supp. p. 989) though rhetorically telling, is of itself legally insufficient. The result would not be different if Roberts had robbed a bank. We see, however, cruelty in the sustained maintenance, over a period of time of a needlessly hazardous condition for plaintiff and other prisoners. We might say careless preparation of a single meal, producing food poisoning in prisoners, was not cruel, but it might be so if the jailors negligently allowed the jail's only drinking water supply to become permanently infected with typhoid bacteria. The word *punishment,* too, implies a wrong in prison management, in contrast to the casual dereliction of a minor prison employee. Thus in an Eighth Amendment case, if there were, as here, no conscious purpose to inflict suffering, we would look next for a callous indifference to it at the management level, in the sustained knowing maintenance of bad practices and customs. When prison wardens are cruel in their attitudes, negligent as well as intended injuries result. This appears to account on the one hand for the cases holding that inadequate care in the state prison hospital is not *per se* a tort actionable under 42 U.S.C. § 1983, e. g., Fear v. Commonwealth, 413 F.2d 88 (3rd Cir.), cert. denied, 396 U.S. 935, 90 S.Ct. 278, 24 L.Ed.2d 234 (1969); United States ex rel. Lawrence v. Ragen, 323 F.2d 410 (7th Cir., 1963); Snow v. Gladden, 338 F.2d 999 (9th Cir., 1964); and on the other, Holt v. Sarver, 309

F.Supp. 362 (E.D.Ark., 1970), an action for injunction and a declaratory judgment, holding that the Arkansas Trusty Guard system is cruel and unusual punishment under the circumstances found by the court.

In framing a definition of "cruel and unusual punishment" it should make no difference whether the litigation before the court under § 1983 is brought for injunction or declaratory judgment, or attempts to assess personal tort liability. In Eighth Amendment litigation often it is the former. Suppose we had before us a suit by uninjured prisoners at the County Farm, seeking to enjoin the supervisors and the superintendent from compelling them to work under the muzzles of loaded shotguns in the hands of ignorant and uninstructed guards. We think the case would fall well within the precedents cited and therefore that the real difficulty is not with the definition of "cruel and unusual punishment" but with the more novel problem of assessing personal tort liability when a breach of the Eighth Amendment has occurred and injury has resulted.

The evidence herein as to beating of juvenile and adult prisoners and the use of a trusty guard previously convicted of assault with intent to kill, come into focus with the demonstrated indifference to prisoners' safety, as establishing a cruel state of mind which with physical harm and causation provide the basis of Eighth Amendment tort liability. So far we speculate, but we do not mean to decide cases not before us: what we hold is that whatever the proper definition of a cruel and unusual punishment, the trial judge rightly decided that this case was within it.

■■ We think that our discussion so far provides an answer to Arterbury's contention that the complaint should have been dismissed for failure to state a Federal claim. We also refer defendant to the opinion of this court in Des Isles v. Evans, 200 F.2d 614, 615 (5th Cir. 1952):

* * *. As stated by Professor Moore, "the courts have ruled time and again that a motion to dismiss for failure to state a claim should not be granted unless it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of his claim." 2 Moore's Federal Practice, 2nd Ed., Sec. 8.13, p. 1653.

If we are mistaken in our analysis of the application of the Eighth Amendment to this case as decided on the evidence, there can be no doubt that plaintiff believed, and alleged, that the injury was purposely inflicted, instead of negligently as the fact proved to be. Only the trial of the case itself established that it was not willful. Federal jurisdiction is established by the good faith allegations of the complaint, not on the facts as they turn out. Levering & Garrigues Co. v. Morrin, 289 U.S. 103, 53 S.Ct. 549, 77 L.Ed. 1062 (1933).

■ We deal finally with Arterbury's contention that it was error for the District Court to reach the state law question under the doctrine of pendent jurisdiction because "the issue of liability on the Federal claim involves a much broader factual situation". The controlling case is, of course, U. M. W. v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), and the classic statement of Justice Brennan is found at page 725, 86 S.Ct. at page 1138:

* * *. The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. Levering & Garrigues Co. v. Morrin, 289 U.S. 103. The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole. (Emphasis in original).

Here the plaintiff has suffered but one injury, with but one causative set of operative facts. This injury and the circumstances which caused it are actionable under both Federal and state laws. This is indeed, a "case where two distinct grounds in support of a single cause of action are alleged". Hurn v. Oursler, 289 U.S. 238, 246, 53 S.Ct. 586, 589, 77 L.Ed. 1148 (1933). In the instant case, once the plaintiff has proved a prima facie case for his Federal claim, he need prove no other facts to show liability of the defendant under state law, and vice versa, as to Arterbury. The allowance of pendent jurisdiction in these circumstances is in keeping with the policy of "judicial economy, convenience and fairness to litigants", U. M. W. v. Gibbs, *supra*, 383 U.S. at 726, 86 S.Ct. at 1139, and well within the discretion of the trial court.

## II.

### Liability of the Individual Members of the Board of Supervisors

The plaintiff has cross-appealed from the District Court's holding that the individual members of the County Board of Supervisors were protected from suit by the doctrine of immunity under both the Federal and state claims.

Plaintiff contends that under Mississippi law, the Board was charged with an affirmative duty to adopt proper regulations for guarding and safekeeping of county prisoners. Miss.Code Ann. § 7904 provides:

> In any county where it is clearly more advantageous to the county to work the county convicts or some of them on the public roads of the county, or on other works of the county exclusively public in their character, the board of supervisors shall have the authority so to order, and in such cases the *board shall establish all proper regulations for the working, guarding, safekeeping,* clothing, housing and subsistence of convicts while so working, and shall provide all the necessary equipment for such purpose. And the board shall establish regulations for the discipline of convicts on said works, and on county farms, when a convict is persistently idle or refractory, and may enforce such regulations by penalties. (Emphasis supplied.)

In fact, the Board issued no order nor established any regulations whatsoever, but merely acquiesced in the manner in which the practice was carried on by Arterbury and his predecessors. This failure of the Board to comply with the statute, according to plaintiff, constitutes "gross nonfeasance" and renders the Supervisors, individual members of the Board, liable in damages. The argument is that the Board may have had discretion in what type of regulations to issue, but it had no discretion not to issue any regulations at all. The statute is directory and in this regard, plaintiff says, provides a *ministerial* rather than a *discretionary* function. The court below, after a thorough review of Mississippi case law came to the following conclusion, 302 F.Supp. at 983:

> While many courts draw a distinction, as would plaintiff, between personal responsibility of a board member for the nonperformance of a ministerial duty, and no liability for failure to perform discretionary duties, that distinction does not appear to obtain in Mississippi, in respect of private suits to redress an individual wrong. * * *

The trial court noted that since the operation of jails and workhouses was a *governmental* rather than a *proprietary* function, there could be no tort liability against the county or the Board as an entity. Jones v. City of Amory, 184 Miss. 161, 185 So. 237 (1939). Also since Arterbury was the agent of the county, not of the individual Board members, the doctrine of *respondeat superior* was not applicable. Jackson v. Gordon, 173 Miss. 759, 163 So. 502 (1935). He found the controlling rule in Wray v. McMahon, 182 Miss. 592, 182 So. 99 (1938),

where the Mississippi Supreme Court said:

> * * * a governmental board or council, in the discharge of the duties imposed by law upon the board or council as such, acts in an official, and not in an individual capacity; and any neglect or failure in the exercise of its powers or in the discharge of its duties is the default of the board and not of the individuals composing it, and they are not liable for such neglect or default unless expressly made so by statute. * * *

Plaintiff is unable to cite us to any statute which imposes liability here but directs us to certain language found in Walton v. Colmer, 169 Miss. 182, 147 So. 331 (1933), that "where acts are ministerial, there is liability for nonperformance of duty, as well as for improper performance of duty." That case, however, is distinguishable because it was a suit brought by the District Attorney for the benefit of the county and not a suit for private benefit. Plaintiff also relies on Stokes v. Newell, 174 Miss. 629, 165 So. 542 (1936). In *Stokes,* the plaintiff had a valid contract of employment with the outgoing board of trustees, to serve as a school principal for the coming year. The incoming board refused to take the necessary ministerial action to have her put on the payroll and refused to allow her to work. The court, holding that the individual trustees were liable, said at p. 545:

> * * * the trustees breached their duty to the plaintiff, appellee here, and became liable for such damages as flowed from such breach of duty to her. * * *. A board, within the scope of its authority and powers under the law, binds the public for whom the board acts. Rights accrue to persons dealing with a board of trustees when it has acted within the scope of its authority, and these rights cannot be legally ignored. * * *

While this case seems to support plaintiff's position, it is significant that all cases which have followed it have involved individuals with vested contract rights, and usually proceeded on a mandamus action. No case has been cited where the duty involved arose not from a contract but from a statute. In any event, the more recent case of People's Bank Liquidating Corp. v. Beashea Drainage Dist., 199 Miss. 505, 24 So.2d 784 (1946), cited by the court below would seem to settle the issue here in favor of the board. In that case, the drainage commissioners were held not liable to the bondholders when they failed in their ministerial duty to assess certain lands to secure the bonds. The court said that liability would not lie even "where a member of a board personally joins in and lends his efforts towards the accomplishment of the wrongful acts of the body or board itself as an entity." We agree with the trial judge that action against the Supervisors is not maintainable under Mississippi law.

It does not follow, however, that a suit against them under 42 U.S.C. § 1983 must be likewise halted, without regard to whatever breach of duty they may have committed in the premises. It seems neither fair nor reasonable to construe this exercise of overriding Federal power, § 1983, in such a way as to assess liability on a mere underling, loyally carrying out his superior's orders, and to shield parties at whose deliberate fiat or decree the deprivation of lawful rights may have actually occurred, nor does it further the purpose of the Act. Under common law, it is true, high Federal officials acting under color of Federal law, in the exercise of their discretionary functions, enjoy absolute immunity against tort liability. Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed. 2d 1434 (1959); David v. Cohen, 132 U.S.App.D.C. 333, 407 F.2d 1268 (1969); Norton v. McShane, 332 F.2d 855 (5th Cir. 1964). In *Norton,* however, we intimated that the immunity of state officials under 42 U.S.C. § 1983 "may be given more limited application", p. 861, and in Anderson v. Nosser, 438 F.2d 183, modified on rehearing 456 F.2d 835 (5th Cir. 1971) this circuit refused to allow immunity under state law to the

officials involved, with respect to their § 1983 liability. There is authority in other circuits that the personal immunities under § 1983 of state or local officials, not judges or legislators, cannot be decided solely by reference to local law. McLaughlin v. Tilendis, 398 F.2d 287 (7th Cir. 1968); Nelson v. Knox, 256 F.2d 312 (6th Cir. 1958).

However, we agree with the trial judge in his further holding (302 F.Supp. p. 985):

> * * *. In the final analysis, plaintiff cannot point to any individual act of a supervisor as having a causal relation to the subject matter of this litigation and the personal injuries sustained by plaintiff, * * *.

except that for "individual act" we would substitute "individual breach of duty." McLaughlin v. Tilendis and Nelson v. Knox, would allow a qualified immunity based on good faith performance of duty as the officials understood it. As to the onerous burden on a plaintiff under § 1983 to satisfy that standard, see Magruder, C. J.'s concurrence in Cobb v. City of Malden, 202 F.2d 701, 705 (1st Cir. 1953). Chief Judge Bazelon of the D. C. Circuit would abolish any absolute immunity for officials exercising discretionary functions and instead would treat

> the degree of discretion available to Government officials in performance of their office and the public interest in protecting the exercise of that discretion as among the "circumstances of the action" to be considered. [Footnotes omitted]. Concurring, in Elgin v. District of Columbia, 119 U.S. App.D.C. 116, 337 F.2d 152, 157 (1964).

We think the Supervisors are in any event not liable for a good faith, reasonable choice among valid policy alternatives, even if an unwise one, and that liability for their negligence will follow only when the plaintiff can show a clear breach of duty that led to the plaintiff's injury.

In considering what breach of duty the Supervisors might have committed, we need not remand for additional findings because the facts concerning their performance are undisputed.

According to plaintiff, the answer is very simple. They were to make regulations and they made none. Thus it would follow from this standard: if they made regulations they would be exonerated even though such supposed regulations said nothing about instructing guards in the use of firearms. This is absurd. If we say they breached their duty by failing to regulate on that special subject, we confront the fact that they were the governmental body responsible for managing all the county business. The state could not have expected them to be specialists on penology, and they could not have been. Therefore, it was not reasonable to require them to instruct Arterbury on all the details of his business. They were to hire a "competent and suitable person" who was to be presumably already knowledgeable how to run a prison farm. Whatever the regulations were to be, it does not seem they had to deal with matters Arterbury should have understood better than they did. The statute is not all that specific. It was Arterbury, not they, who as an experienced penologist knew or should have known of the paramount importance of instructing a guard in detail how to handle safely the firearm that was entrusted to him. The trial judge was not expected to take judicial notice of this: expert testimony was offered. Were the Supervisors expected to know more than the judge? There was no history of prior accidental shooting of prisoners by trusty guards that might have alerted the Supervisors.

It would have been most helpful to us to have placed in evidence examples of Regulations promulgated by the Supervisors of other Mississippi counties. These would have shown us what the legislature of the state had in mind in demanding Regulations. If any of such examples had anything in them about instructing guards in the use of firearms,

it would have been compelling. In the absence of such showing, we are left to guess and speculate what such Regulations are like, and our guess is they contain nothing on the subject.

All five Supervisors visited the County Farm frequently and all used the prisoners for road repairs in their "beats". There were a number of objectionable practices and conditions at the farm of which they were aware or should have been. These included use of a leather strap to punish prisoners, including plaintiff, mingling of juvenile and adult prisoners, and the system of using trusty guards.

The first of these was prohibited by the Eighth Amendment. Jackson v. Bishop, *supra*. But plaintiff is not suing any more for the discipline he received; at any rate the trial judge's failure to make findings with respect to it, or award damages for it, is not assigned here as error.

The assignment of juveniles to an institution without separate facilities for them was apparently the responsibility of the sentencing judge, who was sued but dismissed from the action on the basis of absolute immunity. In fairness to him it should be said that by his testimony, the state institutions suitable to receive plaintiff all had waiting lists, and plaintiff's father told him plaintiff was uncontrollable and could not be taken back into the home. Plaintiff and his father seemingly consented to his being sent to the County Farm, though plaintiff had been there before and should have known what it was like. If the judge was absolutely immune, it may seem strange that he was haled into court and required to account for his actions, but so it was. His testimony is helpful towards an understanding of the background of the case and the conditions with which the remaining defendants had to cope. Arterbury was not even notified the age of juveniles sent to him.

The trusty guard system *per se* was much excoriated in the testimony, and undoubtedly the Supervisors must take responsibility for it. However, its use falls, we believe, outside the ambit of a clear breach of a legal duty. At least one other Mississippi county used it, and some other states. There is no evidence to show that in tolerating or approving it, the Supervisors did not act in good faith and exercise their best judgment, however faulty. The trier of fact found no proof the system was injurious to prisoners' welfare. Despite the opinion testimony the most objectionable feature of the system, in actual experience, was the carelessness of trusty guards in allowing prisoners to escape. There was no history of their accidentally shooting prisoners.

The decision in Holt v. Sarver, *supra*, is not contrary to our trial judge's conclusion because the Arkansas trusty guard system, there involved, went a great deal further than the Mississippi one as displayed in evidence herein. The trial judge, 309 F.Supp. at p. 373, said it was "*sui generis*. The trusties run the prison." He went on that they performed many administrative tasks, had access to other prisoners' records, and had control over the granting or withholding of concessions and privileges to ordinary prisoners. Williams had no powers like these. In holding that the system was "cruel and unusual punishment", moreover, since the suit was for injunction and declaratory judgment, the court there did not have to go on and assess tort liability against anyone.

Even if—as we do not hold—toleration of the system was *per se* a breach of duty, there is no basis for a finding that the Supervisors might have foreseen it would create a hazard of accidental shooting. *Cf.* Palsgraf v. Long Island R. Co., 248 N.Y. 339, 162 N.E. 99 (1928). The trial judge's findings assign the cause of the catastrophe to the failure to train Williams in the safe use of his firearm, and this is a failure in something the Supervisors had a right to expect Arterbury to know the need of. Evidently a paid nonconvict guard would be as dangerous as Williams if likewise untrained. In holding there was no evi-

dence of a breach of legal duty by the Supervisors, that led to plaintiff's injury, we do not wish to be understood as awarding them any accolade, for they are indeed fortunate that the cause of the catastrophe was shown to be what it was. By Judge Bazelon's criterion, the public has an interest in safeguarding them against being mulcted for honest mistakes and catastrophes not caused by their breaches of duty. Plaintiff's eloquent counsel would have them provide the finest county farm that money could buy, or bear the pecuniary consequences of any mishap. No one would wish to serve as a County Supervisor under such a system of law, and the job, like prefectships in the declining days of the Roman Empire, would have to be thrust upon unwilling honorees.

### III.

### Damages

▄▄▄ The District Court awarded plaintiff a judgment in the amount of $85,000 against defendant Arterbury. Plaintiff contends that the amount is "grossly inadequate." Arterbury made no argument on this issue and apparently stands on the opinion of the court below.

From the evidence presented, the court found that plaintiff would be totally disabled throughout his life expectancy of 49 years, and had been deprived of his ability to earn a living. In this regard, the court found it "reasonable to conclude that, upon attaining his majority, plaintiff would have been able to perform ordinary employment, qualifying him for minimum wages under a 40 hour week". The court also found that:

> * * * plaintiff has experienced great physical pain and suffering and also untold mental agony, embarrassment and humiliation; and he will indefinitely continue to endure both physical suffering and mental anguish. His incapacity borders upon personal helplessness in many ways and he will require, for an indeterminate period of time, special care and assistance

from others who are entitled to be reasonably compensated for their service. * * *. 302 F.Supp at 990.

Not only was plaintiff totally blinded but he was handicapped in learning braille by his other injuries. It is plaintiff's position, with which we agree, that the amount of damages awarded indicates that the trial judge based the award solely on the discounted value of the loss of future earnings at the minimum wage rate. We think that $85,000 represents a minimal recovery for that element alone, leaving nothing for the "great physical pain and suffering and * * * untold mental agony, embarrassment and humiliation", nor for his "personal helplessness" requiring the paid services of others. As we said in Grigsby v. Coastal Marine Service of Texas, Inc., 412 F.2d 1011, 1042 (5th Cir. 1969):

> * * *. Obviously, some reasonable allowance has to be made for the other * * * elements. Without even so much as intimating what the awards should be, and certainly not as to awards in other cases * * *, we think this should be reconsidered by the District Judge on the present record with whatever further supplement is appropriate. * * *

There was no evidence of plaintiff's medical and hospital bills up to the time of trial and the trial judge surmised the county may have paid them, (his fn. 33, 302 F.Supp. p. 990, *supra*). He was cared for up to then in various public institutions. There was expert medical testimony removing from the realm of speculation or surmise what plaintiff's future life will be like. Award for pain and suffering and related matters must obviously be in the nature of a "jury verdict" and detailed substantiation is never possible. Therefore, we think the existing record furnishes substantial evidence to support an award for pain and suffering, but the trial judge can supplement it if he deems it to be appropriate to do so. *Grigsby, supra.* At any rate we remand for reconsideration of the amount of damages.

In summary, we affirm the judgment against Arterbury both under state law and under 42 U.S.C. § 1983. We affirm the dismissal of the complaint as against the five members of the County Board of Supervisors, both under state law and under 42 U.S.C. § 1983, but sustain the cross-appeal as to the amount of damages, and remand for further consideration of that issue.

SIMPSON, Circuit Judge (specially concurring):

I concur in the result because I agree that the district court's judgment should be affirmed on the pendent state tort claim asserted by the plaintiff. The plaintiff in good faith filed a facially sufficient Title 42, U.S.C. Section 1983 claim alleging that the defendants under color of state law had violated the civil rights of the plaintiff by the intentional infliction of bodily injury. The district court had jurisdiction to entertain any pendent state claims which arose out of the same circumstances. United Mine Workers of America v. Gibbs, 1966, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218. The jury was justified in holding Arterbury in damages under Mississippi law and the trial court correctly approved the verdict awarding damages against him. I would affirm the judgment on this sole basis.

I disassociate myself from the portion of the majority opinion which posits liability on the cruel and unusual punishment clause of the Eighth Amendment, which provides " * * * nor cruel and unusual punishment *inflicted*". My view is that as a matter of law the plaintiff failed to make out a case for violation of the Eighth Amendment. Punishment is the first element of "cruel and unusual punishment". Absent punishment an act however cruel and unusual may not be transmogrified into "cruel and unusual punishment". The essence of punishment is the intentional infliction of penalty or harm upon another. At the very least punishment comprises conduct so grossly negligent that intent may be inferred from its very nature, applying the concept that a person intends the natural consequences of his acts. I find neither of these elements present in this case. Further, if we say that conduct is present which may be tortured into fitting some definition of punishment that conduct must still be cruel and unusual. Conceding that the injuries suffered by the plaintiff here were most grievous in nature—as they certainly were—they were no more cruelly and unusually inflicted than are similar serious injuries suffered at the hands of any other negligent tortfeasor. Here again, I think that the word "inflicted" is used in the Eighth Amendment to denote an intentional act, not a negligent injury.

My strongly held view then, with all deference to my brothers, is that in basing liability on the Eighth Amendment as well as on state tort grounds, the majority goes beyond anything that requires decision in this case, and does it by an unwarranted extension of precedents of doubtful value. I take particular exception to the use to which the majority puts this Circuit's opinion in Whirl v. Kern, 5 Cir. 1969, 407 F.2d 781, cert. denied 396 U.S. 901, 90 S.Ct. 210, 24 L.Ed.2d 177. I considered *Whirl* to be unsound when it was published, as evidenced by my dissent from the denial of rehearing en banc. The extension of its teachings to cover the situation presented by the instant case graphically illustrates the basis of my original misgivings about the wisdom of the decision.

## ADDENDUM

NICHOLS, Judge:

The panel directed that publication of the foregoing opinions be withheld, at the request of a Fifth Circuit judge not a member of the panel. The reason was his anticipation that the deliberations of the judges of the Circuit, sitting *en banc*, in Anderson v. Nosser, 456 F.2d 835, might produce conclusions inconsistent with our majority opinion, respecting the application of the Eighth Amendment to

instances of mistreatment of prisoners in custody. No one had requested rehearing in Roberts v. Williams, and it would have been a needless imposition on the parties for the court to order it *sua sponte.* The anticipation mentioned has been so far realized that on March 3, 1972, a majority of the active judges of the circuit decided forthrightly that no violation of Eighth Amendment rights warranting the direction of a verdict as to liability was made out below. Meanwhile, in Roberts v. Williams, the plaintiff, Roberts, petitioned for certiorari and it was denied, 404 U.S. 866, 92 S.Ct. 83, 30 L.Ed.2d 110 (1971). In view of the foregoing, the panel has decided to add what follows before publication. We modify our opinion so as to declare that the liability of the defendant, Arterbury, rests upon Mississippi law applied under the doctrine of pendent jurisdiction. The discussion of the meaning of the Eighth Amendment, as applicable to the plaintiff, Roberts, remains relevant primarily in answering defendant Arterbury's contention that the complaint should have been dismissed for failure to state a Federal claim. It is to be taken also as reflecting the impact of the decision below and the briefs and arguments of counsel in Roberts v. Williams, upon the minds of a majority of the panel, as of April, 1971. If we had to decide the same issues again, we would of course be guided by Anderson v. Nosser and by other recent authorities.

Our slip opinion included two references to the panel opinion in Anderson v. Nosser. The first we are asking the publisher to delete. The second at p. 830, should stand as it deals with personal immunities of state officials, a matter not discussed in the *en banc* opinion as it was in the panel opinion; therefore, what is said in the panel opinion remains properly citable.

The individual views of Circuit Judge RIVES and Judge NICHOLS on the subject of Eighth Amendment rights remain unchanged.